# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3173 | **DATE** | 9/22/2004 |
| **CASE TITLE** | Marla Wallin vs. THC-Chicago, Inc., D/B/A | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the foregoing reasons, defendant's motion for summary judgment is granted, and judgment is granted to the defendant on all counts. (28-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | number of notices | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | SEP 2 3 2004 | | |
| ✓ | Docketing to mail notices. | date docketed | | 49 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | | |
| TP | courtroom deputy's initials | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

SEP 23 2004

MARLA WALLIN,                          )
                                       )
            Plaintiff,                 )
                                       )
                                       )      No. 99 C 3173
      v.                               )
                                       )      Judge John A. Nordberg
                                       )
THC-CHICAGO, INC., D/B/A               )
VENCOR HOSPITAL-NORTHLAKE,             )
                                       )
            Defendant.                 )


## MEMORANDUM OPINION AND ORDER

Plaintiff Marla Wallin worked as a pharmacy technician for Kindred Hospital[1] for almost

eight years until she was fired on January 18, 1999 by the Hospital's CEO because she allegedly

talked candidly and openly with coworkers about an affair that she had been having with a doctor

working at the Hospital. Wallin believes that this reason was pretextual and that the real reason

was sex discrimination given that the Hospital did not also fire the male doctor. Plaintiff also

believes that she was the victim of religious, national origin, racial, and retaliatory discrimination

engaged in by her immediate supervisor, an Asian male, who allegedly treated her more harshly

than coworkers on several occasions and who allegedly tainted her reputation in the Hospital,

---

[1]The defendant Hospital is THC-Chicago, Inc. and is doing business as Kindred Hospital
Chicago-Northlake and was incorrectly sued as "THC Chicago, Inc., d/b/a Vencor Hospital-
Northlake." For convenience, we will simply refer to the defendant as the Hospital.

which in turn supposedly induced the CEO to fire her. For the reasons set forth, we grant the Hospital's motion for summary judgment on all counts.

## BACKGROUND

Marla Wallin was hired as a pharmacy technician in April 1991. Her job involved filling patient medication orders, compounding IV solutions, delivering medications to patients' rooms, and overseeing purchasing of drugs and supplies from the Hospital's warehouse. Until December 1996, she had a professional and satisfactory working relationship with four different supervisors. Things began to change in December 1996, when she began reporting to Ted Tse, who is an Asian male. It is undisputed that Tse and Wallin did not get along well during the time they worked together. There is a dispute, however, as to the reason for the conflict and whether it ultimately had any influence on the Hospital's later decision to fire her.

Although she did not believe so at the time of the events in question, Wallin now believes that Tse was discriminating against her. She also believes that his discriminatory bias tainted her reputation in the Hospital. Set forth below are the various incidents and comments that allegedly evidence Tse's discriminatory bias and conduct.

### Tse Makes Two Comments

Wallin claims that Tse made two comments suggesting that he was trying to discriminate against her based on her sex. She described them in her deposition:

> [W]hen he first met me he was like, you know, oh, pretty woman, very pretty woman, and you know, that was okay. But later on he had made a comment []
> either during my performance evaluation or at a time when he brought me in to just discuss a situation with him, that his expectation of me was to be like his little sister. And I said I don't want to be your little sister, I'm your employee, you know, what do you mean by your little sister. I mean I felt that it was a little downgrading of me, you know.

-2-

(Dep. 127.) Although Wallin did not appreciate the comments, she did not view them as sexual harassment at the time they were made. It was only later after she was fired that she concluded the comments were sexual harassment when someone (presumably her lawyer) "said, you know what, that's sexual harassment if someone tells you things like that." (Dep. 172.)

### Tse Gives Wallin Three ECRs

On three occasions, Tse met with Wallin and gave her an Employee Conference Record ("ECR"), which is a document used to memorialize a counseling session held by a supervisor relating to concerns about an employee's job performance. Prior to this time, Wallin had never been given an ECR.

First, in January 1997, Tse gave Wallin an ECR for failing to file complete reports of medication inventory. Wallin thought this was unfair and explained to Tse at the time that her report was incomplete because she did not have a key to the narcotics vault. At the time, Wallin did not believe that Tse's criticism was motivated by any discrminatory animus but instead thought he was confused as to "how we actually had done inventory." (Dep. 41-42.)

Second, also in January 1997, Tse gave Wallin an ECR for clocking in before her shift started. She was again upset. Although she did not believe that the ECR contained any factual misstatements or that Tse was harassing her, she thought it was unfair that she was written up when a Hispanic male co-worker (Tony Zarzoza) allegedly had done the same thing and was not disciplined to Wallin's knowledge. She complained that "Tony was getting special privileges that I wasn't." (Dep. 53.)

Third, in August 1997, Wallin received a third ECR from Tse after he learned that Wallin modified a work schedule of a co-worker (the same male Hispanic identified above with whom

plaintiff had a good working relationship) to keep him from getting overtime while she was on vacation. She changed his schedule because she thought it was unfair that he could get overtime while she was on vacation when she had been unable to get overtime while he was on vacation.

## The 1997 and 1998 Performance Evaluations

On two occasions, Tse gave Wallin performance evaluations that contained two negative marks, which she thought were undeserved.

In April 1997, Tse met with Wallin to discuss her performance evaluation for that year. Although Tse gave Wallin a favorable evaluation and an annual salary increase, she was unhappy because he also gave her (for the first time in her career at the Hospital) two "below standard" marks. Neither mark affected Wallin's overall favorable performance rating. One mark related to her ability to review purchasing contracts and the other related to her ability to get along with co-workers. Wallin complained to Tse, telling him that she had never received any training in reviewing purchasing contracts. Tse agreed with her on this point and revised the mark to "not applicable."

Wallin asked Tse why he thought she did not work effectively with her co-workers. Tse explained that Wallin's co-worker, Alice Lai (who is of Asian descent), told him that she, along with other co-workers, found it difficult to work with her. Wallin admitted that she had communication problems with Lai in the past, but was surprised to hear that Lai would say something like that to Tse.

Towards the end of this April 1997 meeting, Tse gave Wallin three or four biblical scriptures to read. Tse claims that he thought the scriptures would be helpful to Wallin because she had told him in the past that she found religion to be comforting. Wallin disputes that she

-4-

ever told Tse this and says that she was very offended by Tse's actions.[2] A few days later, she complained to Linda Tiemens, who was the Hospital's Assistant Administrator of Clinical Operations.

After investigating the complaint, Tiemens met with Tse and told him not to engage in any further religious discussion, counseled him regarding his method of evaluating Wallin, and told him that he would be required to provide Wallin with documentation supporting any below standard mark. Tiemens also met with Wallin and Tse together. They worked through the various problems and agreed to engage in more open communication and to refrain from discussing their work-related issues with other staff members. Wallin was satisfied with the outcome of Tiemens' investigation. She admits that, after April 1997, Tse never raised the subject of religion with her again.

Wallin had no additional complaints about Tse for a year. Then, on or about April 28, 1998, Tse met with Wallin to discuss her performance evaluation. Although she received a favorable evaluation with an annual salary increase, she again received two "below standard" marks in her performance evaluation. She received a "below standard" mark regarding her willingness to assist co-workers and one regarding her professional interactions with co-workers. According to Wallin, Tse could not explain why she received these marks. She told him that he had not followed Tiemens' instructions regarding his need for documentation before giving her a

---

[2]In her deposition, plaintiff never gave a specific explanation for why she found the scriptures to be offensive. She stated that one of them was "Oh, sinner, repent thee now." (Dep. 70.) It should be noted that the scriptures were given to her before she began having the affair and thus Tse could not have been trying to express disapproval of that conduct.

"below standard" rating. She told him that she considered his actions to be intimidating, harassing, and threatening.

Wallin decided to speak to the administration about Tse's actions but first decided to call him before leaving work that day. She told him that she was going to speak to the administration. According to Wallin, Tse told her to calm down and not to speak with the Administration or he would have to "do things to her that he did not want to do." Tse denies making such a comment.

The next day, on April 29, 1998, Tse amended Wallin's performance evaluation and removed the below standard marks. However, that same day, Wallin filed a grievance with Carol Ptasinski, who had replaced Tiemens as the Assistant Administrator of Clinical Operations. In her grievance, Wallin complained that Tse "harassed" her by giving her two below standard marks and that he threatened her about going to the administration regarding her performance evaluation.

After Ptasinski reviewed Wallin's grievance, she asked Wallin to identify witnesses who could corroborate her allegation that Tse harassed and threatened her. Wallin did not identify any. Ptasinski then interviewed Tse, Wallin's co-workers, and other Hospital employees. During this investigation, the employees allegedly told Ptasinski that Wallin – rather than Tse – was the one creating a harassing environment. These employees allegedly said that they were uncomfortable working with Wallin and did not trust her and that, if Wallin did not get her way, she could be vindictive towards them.

Based on this investigation, Ptasinski told Wallin that it appeared that anyone who gave Wallin direction or requested her to do something, to which she did not agree, she perceived it to

-6-

be harassing. Ptasinski also told Wallin that she learned that Wallin had undermined the pharmacy staff and Tse's authority. Accordingly, on May 13, 1998, Ptasinski suspended Wallin from work for three days based on poor job performance. Wallin admits that from the time she returned from her suspension until the time of her termination in January 1999, she did not have any further work related problems with Tse.

### Wallin's Affair

In June 1997, Wallin began having a "personal relationship" with Douglas Frankel who was a doctor working at the Hospital.[3] The relationship became sexual sometime in October of November of 1997 and lasted until approximately November 1998. Both Wallin and the doctor were married.

At some point it became known by others in the office that Wallin and the doctor were having an affair. Conversations ensued. Wallin admits that she initiated some of these conversations, discussing her affair with co-workers as well as some nurses and respiratory technicians. She admits she discussed some details of the affair, but maintains she did not discuss any explicit details. We quote the key portions of Wallin's deposition in which she described the people with whom she discussed her affair and the general tenor of those conversations:

> I don't remember the names of the nurses [I talked to about the affair], but I know there were some that knew of the relationship and would have asked me about it and would ask for updates. People liked me there. They felt comfortable talking about that. And as long as I guess they knew I felt comfortable talking about it, it was fine. (Dep. 110.)

---

[3]Frankel was not an employee of the Hospital, which does not employ physicians. He was employed by a company named LTV, which provided the Hospital with house physician coverage and allowed Frankel to have medical staffing privileges at the Hospital.

[O]bviously if you're having an affair, they know what you're doing, you're having sex, you're doing certain activities, blah, blah, blah. [] Other than maybe the time that I mentioned to Alice Lai about [Frankel's] wife desiring a threesome. But no, I never went into details about, I mean how do you detail yourself with sex? I mean it's obvious, we're all medical workers, we don't have to go into, you know, the way we touch or, you know, physically when we're together. That's the thing, I never said details. Nobody asked me about the details, and I never told anyone about details. Nobody said I don't want to hear details. Nobody said I don't want to hear about the affair. Basically people had fun with this, you know. I had fun with it. It was entertaining to some. (Dep. 191-92.)

I was having fun having an affair, and people were having fun with the knowledge that I had an affair obviously. [T]hey were interested, they were asking me questions about it, they were very curious, they never, many of them actually said, you know, it looked like a good relationship. They had their own little comments about it. Nobody that I know really came up to me and said, you know what, you really shouldn't get involved or, you know, really said anything bad about it or felt offended. That's the thing, no one ever said to me Marla, shut up, you know, I don't want to hear anymore. No one ever said anything to me like that. Had they said that, I would have said okay, I'm sorry, you know, it won't happen again. (Dep. 193-94.)

### The Hospital Decides To Fire Wallin

Sometime in the fall of 1998, Cyndi Boesen became the Pharmacy Director. On January 12, 1999, she discovered that Wallin had made an error in preparing some medication. She felt the error was serious enough to warrant either a verbal or written warning, especially given that she believed that Wallin had made several other minor errors in the past month.[4] Boesen asked Tse about his plan of action and he allegedly told her that he was hesitant to discipline her for fear of retaliation because she was "evil." Boesen was not happy with this answer as she feared patients would be at risk without some intervention. She then talked to Hardaway.

---

[4]Specifically, Boesen believed that Wallin routinely demonstrated poor aseptic technique when preparing IV admixtures and TPN, which allegedly created a risk that patients would contract infections.

She told Hardaway that she had "detected tension" between Tse and Wallin since the first

week of her employment. After talking to others in the department, Boesen concluded that "a lot

had happened over the years" between Tse and Wallin and that Wallin "clearly had the upper

hand." Boesen learned, for example, that Tse refused to work alone with Wallin, which allegedly

created staffing difficulties on the weekend. Boesen further concluded that "[t]here is a general

opinion among the pharmacy staff that Marla cannot be trusted at her word and basically lies

about everything."

Boesen also explained to Hardaway another "major problem," which concerned Wallin's

interactions with a pharmacy student who was interning at the Hospital for six weeks in October

and November 1998. According to Boesen, Wallin became friends with student and told her

about the affair. (This would have been roughly at the time that the affair was ending.)

After a couple of weeks into her rotation, the student went to Boesen to complain about Wallin's

conversations. The student allegedly said that Wallin would wait until the two of them were

alone in the pharmacy and would then describe her sexual encounters to her in very vivid detail.

According to the intern, Wallin also told her about the "whole history of events" that took place

between her and Tse.

At the time that the intern first approached her, Boesen had only been working at the

Hospital for less than a month and was unsure about how to handle the problem. She talked to

Tse and he said that there was nothing that could be done. Because Boesen did not believe at

that time that it was her place to confront Wallin about "sex talk," she met with Tse and the

student during the student's final evaluation in late November to discuss this problem. At this

meeting, Boesen reports that, although the student did not seem upset or threatened by Wallin's

comments, she clearly felt they were inappropriate and should not have occurred. Boesen hoped

that Tse would then prevent any such behavior from happening again in the future. Boesen

explained the above facts to Hardaway in their January 13th meeting.

Based on Boesen's investigation and conclusions, Hardaway decided to fire both Wallin

and Tse. In a meeting on January 18, 1999, Hardaway told Wallin that she was being fired.

According to a memo prepared a week later, Hardaway explained his reasoning as follows:

> In conducting an investigation of certain complaints made by a member of the
> pharmacy department, it became clear that Marla Wallin [] had been conducting
> herself in a way that was in direct violation of the [Hospital's] sexual harassment
> policy. Specifically, Marla was speaking quite candidly and openly at work
> regarding her sexual relationships with various people, including physicians on
> our medical staff. Ms. Wallin was reportedly discussing such matters with
> members of the pharmacy department and other staff throughout the hospital.
>
> One specific encounter related to a pharmacy student on rotation at [the Hospital]
> from the University of Illinois. During the student['s] exit interview with the
> Manager of the Pharmacy Department, the student revealed that she had been
> placed in an uncomfortable position due to the sexually explicit nature of the
> conversations initiated by Ms. Wallin.
>
> When confronted about the allegations, Ms. Wallin did not dispute any of the
> events. In fact, she revealed that she had numerous conversations of a sexually
> explicit nature with a variety of people in the organization, including the
> pharmacy student, and on multiple occasions.

Also in attendance at this meeting was Elizabeth Hanna Wade, the Assistant

Administrator at the time. She stated in an affidavit that Wallin admitted that she discussed the

details of her sexual relationships in the work area and also stated that it was something that

"everyone knows about."

The same afternoon that Wallin was fired, Tse was asked to come to Hardaway's office.

He was also fired. Hardaway gave two reasons. First, when Tse learned that the pharmacy

student had been made uncomfortable, he failed to notify anyone in management or human resources about the issue. Second, when Tse learned that Wallin had "on several occasions made significant job related errors in the form of Medication Errors that could have been detrimental to the safety of [] patients," Tse "elected to manage the performance of Ms. Wallin by sending blanket memorandums to the entire staff regarding the errors, without ever specifically addressing the performance issues of Ms. Wallin." Tse responded by saying that he took no action in the above two cases was because he was fearful that Wallin might file a lawsuit.

A week after she was terminated, on January 25, 1999, Wallin filed an EEOC discrimination charge. In this charge, the only act of discrimination mentioned is the claim that the Hospital engaged in sex discrimination by firing her for having an affair when it failed to fire Frankel for engaging in the same behavior. On March 30, 1999, Wallin filed a second EEOC charge. This time she was represented by her current lawyer. In this charge, she added claims for racial, national origin, religious, and retaliatory discrimination.

## DISCUSSION

Although plaintiff asserts six claims of discrimination based on different theories, all her claims rest on the same underlying factual predicate, which is her assertion that Tse was trying to discriminate against her because she is a white, American woman with Christian beliefs. Plaintiff's accusations against Tse can be broken down into two categories. The first consists of those acts taken directly by Tse while he was her supervisor – *i.e.* the two allegedly sexist comments, the three ECRs, the two performance reviews, giving her biblical verses, and the threat to get her if she complained about the April 1998 review. The second category is simply

-11-

the Hospital's decision to fire her. Although this decision was made by Hardaway, plaintiff

believes that Tse influenced the decision. We consider each category below.

## I. Acts Before Firing.

The Hospital argues that plaintiff cannot recover for any of the direct actions taken by Tse

before her firing because they took place more than 300 days before plaintiff filed her second

EEOC charge. Plaintiff agrees that these acts took place outside this 300-day period but seeks to

rely on the continuing violation doctrine. However, to the extent that plaintiff is suing for

discrete acts of discrimination, she cannot rely on this doctrine. *See National Railroad*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("discrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely filed charges").

Therefore, the only possible claims for which she may use the continuing violation

doctrine are her claims for sexual and religious hostile environments. *Id.* But this doctrine

cannot help plaintiff here because she has not pointed to any harassment that took place within

the 300-day period. It is undisputed that her hostile environment claim relating to religion rests

on only one incident (the giving of biblical verses) that took place well outside the 300-day

period. After that event, plaintiff never encountered any further comments about religion from

Tse or anyone else.

As for her hostile environment claim based on sex, this too is time-barred because it is

based on two comments made by Tse (that she was "pretty" and that he expected her to act "like

his little sister"). These comments occurred well outside the period, and plaintiff cannot link

them to any other sexually harassing comment within the period. Plaintiff argues that Tse said

she was not a moral person but this comment is not tied to her sex. She also tries to point to the

-12-

fact that she was fired. But her firing was not an act creating a hostile environment but was (allegedly) an example of disparate treatment between her and the male doctor. It therefore is not part of the same hostile environment claim. For these reasons, plaintiff's termination cannot be used as the hook to draw in the untimely acts.[5]

## II.     Discrimination Based On Firing.

Plaintiff is thus left with only her claim that the Hospital engaged in sex discrimination by treating her worse than the male doctor who was not fired (or disciplined) for having an affair. Plaintiff seeks to rely on the indirect *McDonnell-Douglas* method. She asserts that she has made out a *prima facie* case because she has alleged that she was performing her job adequately, that she was fired for having an affair, and that a similarly situated male was not fired for the same thing.

The Hospital argues that plaintiff has not established a prima facie case because the doctor is not similarly situated. The Hospital makes two arguments: (i) the doctor was not an employee and therefore the Hospital could not fire him; (ii) the doctor never discussed the affair with coworkers while plaintiff did.

As to the former argument, neither side has presented any authority one way or the other on whether the doctor's status as a physician working for another company under contract with the Hospital renders him unsuitable for comparison as a similarly situated employee. For

---

[5]In any event, plaintiff's claim for a hostile sexual environment would fail on the merits because these few isolated and relatively harmless comments fall well short of the type of pervasive and severe environment typically required by the Seventh Circuit to make out such a claim. *See generally Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women.").

purposes of this analysis, we are willing to proceed under the assumption that this distinction does not matter. Even if the Hospital could not fire the doctor, it could have disciplined him or ended his privileges on staff. Hardaway suggests in his affidavit that the Hospital had this power.

As for the latter argument, we agree with the Hospital. Hardaway stated that he fired plaintiff for *discussing* her affair with others in the office and not for *having* an affair. It is undisputed that Frankel did not discuss the affair with others in the office. This is a salient difference as the Hospital reasonably could have been more concerned about the disrupting effect of daily conversations and gossip than it was concerned about the underlying conduct that did not take place during work hours. For this reason, we agree with the Hospital's argument that plaintiff has failed to state a *prima facie* case.

Even if plaintiff had established a *prima facie* case, her claim would still fail because she has not shown that the Hospital's stated reason for firing her was pretextual.[6] "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Ill. Dept. of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004). Even if the decisionmaker made what might be considered an ill-considered or unreasonable decision, pretext is not shown as long as the decisionmaker "honestly believed" the nondiscriminatory reason he gave for taking the action. *Id.*

_____

[6]Although plaintiff has not suggested that she is proceeding under the direct method, she arguably could try to do so with regard to her "cat's paw" theory. But if she did, the result and analysis would be the same. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) ("whether a plaintiff proceeds under the direct or indirect method of proof, the ultimate standard is the same: the plaintiff must demonstrate that the employer would not have made the adverse employment decision in question but for his membership in a protected class").

Plaintiff relies on two arguments to establish pretext. First, she claims that the pharmacy student denied in her deposition ever stating that she was uncomfortable with Wallin's discussions of her affair. Plaintiff is thus claiming that one of the key reasons given for her firing is untrue. Second, she claims that Tse indirectly caused her to be fired by tainting her reputation in the Hospital. As set forth below, neither argument is sufficient to defeat summary judgment.

The first argument fails because plaintiff has mischaracterized the student's deposition testimony. Although plaintiff claims that the student denied complaining to Boesen, a fair reading of the deposition excerpts provided to the Court reveals that she did not deny that the alleged conversations took place but simply that she could not remember them. In fact, she conceded at several points that they "may have happened." (Dep. 20, 36.) Moreover, Wallin has admitted that she talked to the student about the affair on at least one occasion when she discussed a vicious rumor that was circulating in the office (more on this below). This witness's failure to recall these conversations is therefore not probative, especially since she was deposed almost four and half years later. The Hospital has never suggested that she was traumatized by these conversations, in which case you might expect to her to remember them, but instead has stated that she was uncomfortable with them and thought they were inappropriate.[7] In addition, in light of all the evidence discussed below, plaintiff cannot credibly maintain that the Hospital's claim that she spoke openly about the affair has no basis in fact.

_____

[7]In contrast to the time lag between the events and the student's deposition, Boesen took notes at the time and prepared a memo a week after plaintiff's firing. When the student was asked at her deposition whether she had any grounds for believing that Boesen would be untruthful or misreport what she had said, she testified that Boesen "was a smart lady, and I don't think she'd make something up like that." (Dep. 40; *see also* 21-22.)

Plaintiff's second argument for pretext is more involved but is ultimately also insufficient. Plaintiff claims that Tse influenced the decision to have her fired. She puts it this way in her response brief: "A question of fact exists as to whether Tse's religious, race and national origin preferences, and Wallin's resulting complaints regarding Tse, began a chain of events resulting in Wallin's reputation becoming tainted in the hospital and ultimately leading to Wallin's termination[.]" (Resp. at 8.)

It is important to understand plaintiff's argument fully before analyzing it further. She has introduced no evidence – nor has she even sought to argue – that Hardaway or Boesen, the two individuals involved in the decisionmaking process, harbored any discriminatory bias against her.[8] Normally this fact would doom a plaintiff's claim. However, a plaintiff may avoid this rule if she can show that "an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action" taken by a higher-up employee. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994). This exception applies where the biased employee (i) conceals relevant information from the decisionmaker or (ii) feeds false information to him. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997). Ultimately, the inquiry is whether the discriminatory motive of the other employee – rather than the "autonomous judgment" of the ostensible decisionmaker – was the "real cause" of the adverse employment action. *Id.* This is sometimes referred to as the "cat's paw" theory. *See, e.g., Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004).

---

[8]We do not even know Hardaway's or Boesen's national origin, race, or religion. In *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997), the Seventh Circuit concluded that common sense suggests that it would be "highly unlikely" that a decisionmaker would discriminate based on national origin against an employee of the same national origin.

To fall within this exception, plaintiff must overcome two hurdles. She must first show that Tse had a discriminatory animus or motive of the kind prohibited by Title VII and then she must show that he exerted influence over the termination decision.

As to the first proposition, it is undoubtedly true that Tse and plaintiff did not get along. Everyone agrees on this point. As noted above, Tse and plaintiff clashed over the 1997 and 1998 performance reviews. When plaintiff told Tse she was going to complain to the administration about the 1998 performance review, he allegedly threatened to "do things to her that he did not want to do." Plaintiff did not like it when Tse gave her bible verses after the 1997 performance review. Tiemens investigated this incident and counseled both of them to try to communicate better together to resolve their conflicts. Ptasinski likewise, in 1998, tried to clarify miscommunications between the two and sought to get them past their differences. Co-workers in the department also noticed the conflict between these two individuals. When Boesen first started working in the fall of 1998, she could sense the tension in the office from the two. Tse did not want to work weekends alone with plaintiff. Boesen also stated in her memo that Tse described plaintiff as "evil." Plaintiff also alleges that Tse told people in a meeting that plaintiff was not a "moral person"[9] Based on all this evidence, a reasonable jury certainly could conclude that Tse did not like plaintiff and could infer that he would have been happy to see her fired.

But it is important to remember that plaintiff must ultimately show that Tse's dislike of her was *because of* one of the prohibited biases set forth in Title VII rather than simply as a personality conflict or office dispute. *See Wallace*, 103 F.3d at 1399 (listing many, non-

---

[9]As the Hospital points out, this testimony is hearsay and thus inadmissible.

actionable explanations for why one employee might try to get another fired, ranging from nepotism to personality conflicts).

To establish this initial point, plaintiff relies on the various pre-discharge acts and comments previously summarized. Yet these acts and comments are sporadic, ambiguous, and based on differing and contradictory theories of discrimination. Early on in their relationship, Tse allegedly told plaintiff that she was "pretty," thus suggesting that he was interested in her romantically. But Tse later disciplined plaintiff for things for which he did not discipline a co-worker who was a Hispanic male, suggesting that Tse did not like women. Yet, plaintiff also alleges that Tse treated an Asian woman better than her on one occasion, suggesting that Tse was then motivated more by his dislike of Americans and whites rather than women. Plaintiff did not like it that Tse gave her plaintiff biblical verses on one occasion. This supposedly indicates that he harbored a bias against religion. Yet Tse and plaintiff are both Christians. Plaintiff thus apparently believes (though she does not provide any explanation in her brief) that Tse practiced a different form of Christianity.[10]

Even though we find this evidence sparse and patchwork, mindful of the standards of summary judgment, we are willing to give plaintiff the benefit of the doubt on this first proposition. However, we find that plaintiff cannot convince a reasonable jury that Tse – rather than Hardaway or Boesen – was the "real cause" of her firing.

---

[10]Plaintiff's claim that Tse was acting based on discriminatory motives is also weakened by the fact that, at the time of the events in question, she did not think that the conflict was based on any particular form of discrimination and by the fact that Ptasinski concluded, after her May 1998 investigation, that plaintiff thought she was being "harassed" whenever someone asked her to do something that she did not want to do.

To begin with, plaintiff has admitted that Tse was not "involved in the decision to terminate" her. *See* St. of Mat. Fact # 54. This admission by itself significantly undermines, if not dooms, her argument. She instead relies on a more nebulous theory, arguing that Tse "began a chain of events" that in turn led to her reputation being "tainted" which in turn caused Hardaway and Boesen to fire her. It is far from clear that this type of remote and indirect chain of causation is enough to prevail under a "cat's paw" theory. The cases speak of a more direct connection. *See Russell v. Bd. of Trustees of the Univ. of Ill. at Chicago*, 243 F.3d 336, 342 (7th Cir. 2001) (subordinate played an "*extensive role* in initiating and carrying out the disciplinary process") (emphasis added); *Cerutti*, 349 F.3d at 1063 (two individuals who participated in decisionmaking panel did not affect the panel's deliberations "to such a degree" as to be the actual cause of the termination).

The record here contains no evidence to suggest that Tse had any authority or influence with the administration or was in any way pulling the strings behind the scenes. As noted above, plaintiff agrees that Tse did not participate in the decision to fire her and was apparently unaware that this decision was even being considered. There is no evidence that he talked to Hardaway or had any clout with the administration. *Cf. Wallace*, 103 F.3d at 1396 (although allegedly biased employee did not have authority over personnel decision, he reported to the president of the Japanese parent corporation). Likewise, nothing suggests that Tse's opinion was valued highly. When plaintiff complained in 1997 about being given biblical verses, the Hospital ordered Tse to stop this behavior. The Hospital was well aware that the two did not like each other.

Also the investigation that led to plaintiff being fired was not started by Tse nor did he have any significant input. Instead, it was Boesen who independently observed what she

perceived to be a medication error by plaintiff. Her discovery – and not some comment by Tse – triggered the investigation. It is undisputed that Tse had no role in reporting the medication error and in fact was faulted for not being more aggressive in bringing it to the attention of his supervisors. Similarly, the student first reported to Boesen that she was uncomfortable working with plaintiff. Again, there is no evidence to suggest that Tse was hiding behind the scenes, prompting her to go to management with her complaints. Boesen also worked in the office and talked to all the employees. In sum, Boesen had independent sources supporting her findings about plaintiff. *See Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754 (7th Cir. 2000) (affirming summary judgment for employer because the biased employee's input was not the "sole" source of the perception of poor performance, which was derived from supervisor's "own observations and input from others").

The strongest piece of evidence and the one that really dooms plaintiff's entire theory is the fact that the Hospital fired Tse for not being more aggressive in reporting on and disciplining plaintiff. Boesen complained that, when plaintiff made a medication error, Tse did not directly fault her but instead just sent a general memo to all workers. The Hospital concluded that Tse was afraid of plaintiff, was unwilling to discipline her, and was too lenient in the way he dealt with her. This is completely at odd's with a cat's paw theory in which a subordinate employee is an aggressive force behind the scenes. Plaintiff's theory thus rests on the hard-to-believe notion that Tse secretly and subtly manipulated Boesen and Hardaway into firing plaintiff while, at the same time, covered up his tracks by acting passively around the office and refusing to come forward with any explicit criticism of her.

Another significant problem with plaintiff's theory is that the Hospital's stated reason for firing her is substantiated by the current record based on the undisputed facts. Most notably, plaintiff has admitted that she talked with co-workers about the details of her affair and that she initiated conversations with them. (Dep. 109.) Even more telling is the fact (undisputed by plaintiff) that, when she was fired, she "admitted to Hardaway and Wade that she had discussed the details of her relationship with Frankel with others at the hospital." *See* St. of Mat. Fact #52. Her response at the time was not to deny the allegation but to downplay its seriousness by saying, "everyone knows about that." Given these admissions, plaintiff cannot prove that the Hospital's stated reason for firing her has no basis in fact or is somehow made up.

Not only has plaintiff admitted that she talked openly about the affair, but others have confirmed this point as well. Specifically, Alice Lai stated that plaintiff told her that the doctor's wife wanted to have a "threesome." Lai also testified that plaintiff frequently spoke of the sexual nature of her relationship and that some nurses asked Lai why plaintiff spoke openly about the affair. (Dep. 25.) Similarly, in her May 1998 investigation, Ptasinski was told by employees that Wallin's conversations of the affair made them uncomfortable. *See* St. of Mat. Fact # 47. All of the above facts undermine plaintiff's "cat's paw" theory. *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 (7th Cir. 2000) (even if supervisor did rely on biased employee's memo criticizing plaintiff's performance, summary judgment was still appropriate because employee conceded that the allegations against her were true).

Although plaintiff repeatedly states that she believes that Tse somehow caused Hardaway to fire here, she fails to explain specifically how he brought about this result. There is no evidence that Hardaway or Boesen considered or even knew about her performance reviews,

which were not even unfavorable.  In any event, these events were removed in time from the firing.  Plaintiff claims that Tse talked about her affair with others in the office, but she has offered no testimony from any witnesses confirming this point.  All the other witnesses paint an opposite picture of Tse not wanting to hear about or participate in these discussions.  Even if Tse had talked about the affair, this hardly constitutes "feeding false information" as it is undisputed that she was having an affair.  And given the fact that plaintiff herself initiated some of the conversations, it cannot be said that Tse was the real cause of these discussions.  Plaintiff has alleged that Tse said she was not a "moral person" and Boesen confirmed that he said on one occasion that plaintiff was "evil."  While these comments are negative, they are on their face so clearly opinions that they too cannot constitute false information.

In the end, plaintiff controlled her fate.  She chose to engage in the affair and then she chose to initiate conversations about it with co-workers.  Tse had no power over these events, and thus any comments he may have made concerning the affair were so insignificant as to not have any impact on the decision.

Rather than disputing the basic allegation that she talked openly about the affair, plaintiff instead offers two explanations, both of which are ultimately irrelevant to the analysis.  She first quibbles whether she discussed any explicit details about the affair.  She explained in her deposition that she would talk about some aspects of the affair, like the fact that she and the doctor went out to lunch, sat in the car, and kissed, but that she did not mention more explicit details about where or when the two of them had sex.  She claims that she did not need to discuss such details because everyone knew what was going on: "obviously if you're having an affair, they know what you're doing, you're having sex, you're doing certain activities, blah, blah,

-22-

blah." (Dep. 191.) Others have suggested that plaintiff was somewhat more explicit. As noted above, Boesen reported that the student intern mentioned that plaintiff discussed vivid details.

These differences cannot defeat summary judgment because they are minor, because individuals often have different perceptions about what is explicit (is kissing in a car at lunch an explicit detail?), and because the Hospital's stated reason for firing her did not rest exclusively on a finding that plaintiff discussed the details of the sex act but rather that she discussed the details of her affair, something she has admitted doing.

Plaintiff's second response is to argue that her co-workers were not uncomfortable with these conversations. In fact, she says that they "had fun with this" and that it was "entertaining to some." (Dep. 192.) One problem with this line of argument is that the only support for this assertion is plaintiff's perception that others were not uncomfortable because they never complained to her directly. But this does not prove that others were comfortable; they may have just felt shy or have been afraid to confront her directly. Tse and Lai both testified as much. Lai said she did not like the conversations but felt she should not complain because it was "personal stuff." Moreover, even if plaintiff is correct that these conversations were a source of entertainment and enjoyed by all, that does not mean that they were a good thing. The Hospital reasonably could have believed that these conversations were still time-consuming, distracting, and unprofessional.

Finally, although plaintiff claims that the conversations were in effect harmless, her own testimony casts doubt on that claim. She said that at one point she talked to the student intern about a false rumor going around the Hospital that she and the doctor had been found "banging each other in a car parking lot." (Dep. 190.) She said that she told the student about this one

-23-

explicit detail merely to illustrate to the intern "how vicious and malicious it had gotten." (*Id.*)

But the existence of vicious rumors circulating in the office shows that this was not simply a case

of harmless water cooler gossip as plaintiff suggests.[11]  For all the reasons stated above,

plaintiff's pretext evidence is not enough to defeat summary judgment even assuming she could

establish a *prima facie* case.

---

[11]Plaintiff has never suggested that Tse was the source of this particular rumor.  The fact that someone else in the office would spread a false and vicious rumor about plaintiff casts some doubt on her claim that she was universally liked by everyone in the office.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted, and judgment is granted to the defendant on all counts.

**ENTER:**

_John A. Nordberg_
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** _September 22, 2004_